**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

CITY OF BUFFALO,

Plaintiff,

vs.

J. CONRAD SENECA, in his official capacity as Council President of the Seneca Nation of Indians, TINA ABRAMS, in her official capacity as Councilor of the Seneca Nation of Indians, RICKEY L. ARMSTRONG, in his official capacity as Councilor of the Seneca Nation of Indians, JOSH JIMERSON, in his official capacity as Councilor of the Seneca Nation of Indians, MAURICE A. JOHN SR., in his official capacity of as Councilor of the Seneca Nation of Indians, ODIE PORTER, in her official capacity as Councilor of the Seneca Nation of Indians, CHRISTIAN REILLER, in his official capacity as Councilor of the Seneca Nation of Indians, KEVIN SENECA, in his official capacity as Councilor of the Seneca, TODD GATES, in his official capacity as Councilor of the Seneca Nation of Indians, JEFFREY GILL, in his official capacity of Councilor of the Seneca Nation of Indians, GERALDINE HUFF, in her official capacity as Councilor of the Seneca Nation of Indians, ELIOT JIMERSON, in his official capacity as Councilor of the Seneca Nation of Indians, MARTA KETTLE, in her official capacity as Councilor of the Seneca Nation of Indians, LISA MAYBEE, in her official capacity as Councilor of the Seneca Nation of Indians, KLINT NEPHEW, in his official capacity as Councilor of the Seneca Nation of Indians, JONATHAN D. WILLIAMS, in his official capacity as Councilor of the Seneca Nation of Indians.,

Defendants.

No. 26-cv-02279 (MAV)

**THE SENECA DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND AND MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL AND PROCEDURAL HISTORY ........................................................................ 3

A. The SNSA and the Federal Restricted-Fee Determination ............................. 3

B. The State Complaint ........................................................................................ 4

C. Removal and the City's Parallel Federal Action ............................................. 5

LEGAL STANDARD ............................................................................................................ 6

ARGUMENT ........................................................................................................................ 8

I. THE MOTION TO REMAND SHOULD BE DENIED ............................................ 8

A. The City Has Pleaded A Significant Federal Question Under *Grable* ............................................................................................................... 8

i. The City Affirmatively Pleaded the Relative Scope of Federal and Municipal Jurisdiction as an Essential Element of Its Claims ................................................................. 9

ii. The Federal Issue Is Actually Disputed and Substantial ................... 12

iii. A Federal Forum Will Not Disturb the Federal-State Balance ........................................................................................ 13

B. The City's Arguments For Remand Fail ..................................................... 15

II. THE CITY'S MOTION FOR A TRO SHOULD BE DENIED ............................... 17

A. The City Is Unlikely To Succeed on Its Claims .......................................... 17

i. The Site Is Not Subject to Regulation by the City ............................ 17

ii. The Suit is Barred by Principles of Sovereign Immunity .................. 21

B. The City Will Not Suffer Irreparable Harm if a TRO is Denied ................... 22

C. The Balance of Hardships Does Not Tip in the City's Favor, and a TRO Would Disserve the Public Interest .................................................. 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
96 N.Y.2d 280 (2001) ....................10

*Belmont v. JetBlue Airways Corp.*,
401 F. Supp. 3d 348 (E.D.N.Y. 2019) ....................15

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2d Cir. 2005)....................15

*California v. Cabazon Band of Mission Indians*,
480 U.S. 202 (1987)....................12

*Carney v. Washington*,
551 F. Supp. 3d 1042 (W.D. Wash. 2021)....................13

*Caruso Glynn, LLC v. Liberty Corp. Cap. Ltd.*,
No. 1:25-CV-04312, 2026 WL 2640723 (E.D.N.Y. Sept. 8, 2026) ....................14

*Caterpillar Inc. v. Williams*,
482 U.S. 386 (1987)....................15

*Cayuga Indian Nation of New York v. Vill. of Union Springs*,
293 F. Supp. 2d 183 (N.D.N.Y. 2003)....................24

*Cayuga Nation v. Tanner*,
448 F. Supp. 3d 217 (N.D.N.Y. 2020), *aff'd*, 6 F.4th 361 (2d Cir. 2021) ....................21

*Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*,
802 F.3d 267 (2d Cir. 2015).................... *passim*

*City of Sherrill, N.Y. v. Oneida Indian Nation of New York*,
544 U.S. 197 (2005)....................20

*Comm'r of N.Y. DOT v. Polite*,
236 A.D.3d 82 (2d Dep't 2024) ....................20

*Copart Indus., Inc. v. Consol. Edison Co.*,
41 N.Y.2d 564 (1977) ....................10

*Dinardi v. Ethicon, Inc.*,
145 F.R.D. 294 (N.D.N.Y. 1993)....................15

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
922 F. Supp. 2d 475 (S.D.N.Y. 2013)....................11, 13

*Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*,
405 F. Supp. 3d 408 (W.D.N.Y. 2019) ....................10

*Gingras v. Think Fin., Inc.*,
922 F.3d 112 (2d Cir. 2019) ....................21

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005) .................... *passim*

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) ....................8

*Gunn v. Minton*,
568 U.S. 251 (2013) ....................6, 9, 12, 13

*N.Y. ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*,
824 F.3d 308 (2d Cir. 2016) ....................6, 11, 12, 13

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*,
523 U.S. 751 (1998) ....................21

*Landesbank Baden-Württemberg v. Cap. One Fin. Corp.*,
954 F. Supp. 2d 223 (S.D.N.Y. 2013) ....................7

*Lewis v. Clarke*,
581 U.S. 155 (2017) ....................21

*Mahoney v. U.S. Dep't of the Interior*,
No. 22-CV-01305-FB-ST, 2022 WL 1093199 (E.D.N.Y. Apr. 12, 2022) ....................23

*Martin v. Warren*,
482 F. Supp. 3d 51 (W.D.N.Y. 2020) ....................7

*Massachusetts v. Wampanoag Tribe of Gay Head*,
36 F. Supp. 3d 229 (D. Mass. 2014) ....................16

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam) ....................7

*Metro. Life Ins. Co. v. Taylor*,
481 U.S. 58 (1987) ....................6

*Michigan v. Bay Mills Indian Cmty.*,
695 F.3d 406 (6th Cir. 2012), *aff'd*, 572 U.S. 782 (2014) ....................12, 13

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*,
883 F.3d 32 (2d Cir. 2018) ....................7

*N.Y.C. Health & Hosps. Corp. v. WellCare of N.Y., Inc.*,
769 F. Supp. 2d 250 (S.D.N.Y. 2011) ....................11

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
770 F.3d 1010 (2d Cir. 2014)....................15

*New York v. Arm or Ally, LLC*,
644 F. Supp. 3d 70 (S.D.N.Y. 2022)....................11, 14

*New York v. Shinnecock Indian Nation*,
686 F.3d 133 (2d Cir. 2012)....................15, 16, 17

*NuPower, LLC v. Charter Oak Microgrid Holdco, LLC*,
No. 1:26-CV-00494, 2026 WL 1960869 (N.D.N.Y. June 30, 2026)....................7, 8

*Oklahoma Tax Commission v. Graham*,
489 U.S. 838 (1989)....................15

*Peralta v. Matz*,
No. 22-CV-2422, 2025 WL 2208328 (E.D.N.Y. Aug. 4, 2025)....................15

*Ret. Sys. v. WorldCom, Inc.*,
368 F.3d 86 (2d Cir. 2004)....................6

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)....................23

*Shinnecock Indian Tribe v. Hochul*,
No. 25-CV-07034, 2026 WL 279849 (E.D.N.Y. Feb. 3, 2026) ....................16

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
131 F.4th 102 (2d Cir. 2025) ....................7

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024)....................7

*Sunset Homeowners Ass'n v. DiFrancesco*,
386 F. Supp. 3d 299 (W.D.N.Y. 2019)....................14

*State ex rel. Tong v. Exxon Mobil Corp.*,
83 F.4th 122 (2d Cir. 2023) ....................6, 16

*Town of Carmel v. Melchner*,
105 A.D.3d 82 (2d Dep't 2013)....................9, 11

*Town of N. Hempstead v. Vill. of N. Hills*,
38 N.Y.2d 334 (1975)....................10, 11

*Town of Southampton v. Goree*,
229 N.Y.S.3d 906 (Sup. Ct., Suffolk Cnty. 2025)....................20

*Vill. of Huntington Bay v. N.Y. State Dep't of Env't Conservation*,
235 A.D.3d 881 (2d Dep't 2025)....................9

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ....................7

**Statutes**

25 U.S.C. § 1774d (2010) ....................17

25 U.S.C. § 1774f (2010) ....................17

28 U.S.C. § 1331 ....................5, 11, 15

28 U.S.C. § 1441 ....................6

28 U.S.C. § 1447 ....................7

Executive Law § 381 ....................9

General City Law § 19 ....................9

N.Y. Const. art. IX. ....................9

N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(11)–(12) ....................5, 9

**Other Authorities**

25 C.F.R. § 1.4 ....................1, 9, 19

Fed. R. Civ. P. 19 ....................14

Fed. R. Civ. P. 42 ....................14

Seneca Nation Settlement Act of 1990. Pub. L. No. 101-503, 104 Stat. 1292
(1990) ....................3

## PRELIMINARY STATEMENT

The City of Buffalo moves for remand on the ground that its claims arise solely under state and local law. But the plain terms of its complaint (the "State Complaint") say otherwise. Both of the City's claims are premised on the existence of regulatory jurisdiction over the disputed parcel (the "Site"), and its prayer for relief seeks an explicit declaration concerning the same. *See* State Compl. at 18 ¶¶ i–ii (seeking declaration that "the Site is subject to the municipal jurisdiction of the City of Buffalo including land use, tax, police, and environmental laws"). But as the City admits, the Site is now held in restricted-fee status, following the 2023 federal Department of Interior ("DOI") approval, under the Seneca Nation Settlement Act. Compl ¶¶ 9–11. And under federal law, Congress intended for such restricted-fee lands "to be subject to the Seneca Nation's tribal jurisdiction"—such that "New York has . . . been divested of its jurisdiction" over them. *Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 282–86 (2d Cir. 2015) ("CACGEC"); *see* 25 C.F.R. § 1.4(a) (providing that "none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof" apply to such lands). Accordingly, unless and until it prevails on the disputed federal issue regarding whether the restricted-fee decision was valid, the City has no state-law claim.

The City knows this. The day after filing this case in state court, the City sued DOI in this Court, alleging that the February 14, 2023 restricted-fee decision "impairs the City's regulatory, zoning, and police power" over the Site and that vacating it would "restore local control" ( "APA Compl.")—a telling concession that the City cannot bring its state-law claims without first successfully challenging that decision. Both complaints thus seek the same federal-law relief: a declaration that the Site is "subject to the municipal jurisdiction of the City" (State Compl. at 18 ¶¶ i–ii) or "under the regulatory jurisdiction of the City" (Compl., *City of Buffalo v. U.S. Dep't of the Interior, et al.*, No. 26-cv-02275 (W.D.N.Y. Oct. 8, 2026), APA Compl. ¶ 33), rather than

exclusively under the civil jurisdiction of the United States and the Seneca Nation of Indians. Despite its futile effort to plead around federal jurisdiction by contending that the restricted-fee status of the Site is "not dispositive," its APA Complaint and CACGEC confirm otherwise.

Removal therefore rests on the City's pleading choices, not on a tribal immunity or preemption defense: by seeking a declaration that state and municipal jurisdiction prevail over federal jurisdiction as an essential element of its claims, the City has pleaded its way into federal court.

This Court should also deny Plaintiff's motion for a temporary restraining order ("TRO"): the City has no likelihood of success and there is simply no emergency requiring the Court to act now. The City has known since at least August 2023 that the Site is held in restricted fee, and since at least April 2026 that the Nation planned to build a gas station on it—spending the intervening six months negotiating a stormwater agreement with the Nation rather than seeking relief. Construction is in its earliest stages and will not be complete until mid-2027, and the Nation is already devoting substantial time and money to environmental testing, undermining the City's professed concern about environmental contamination of neighboring lands and waters. The Court should therefore retain jurisdiction, decline to issue a TRO, and either deny or set a briefing schedule and hearing date on the preliminary injunction sought by the City.[1]

---

[1] In opposing the Preliminary Injunction, the Nation intends to submit substantive papers and evidence concerning, among other things, (i) the Nation's acquisition of the Site, (ii) the process f the Nation followed to obtain DOI approval to place the Site into "restricted-fee status," including notice to the City, (iii) the correctness of that restricted-fee decision (iv) the current status and timeline of the Nation's construction of a gas station known as the Seneca One Stop on the Site (the "Project"), and (v) the status of all environmental testing and remediation work. Defendants address these issues below on a highly expedited basis and will substantially supplement that information in their preliminary injunction opposition.

## FACTUAL AND PROCEDURAL HISTORY

### A. The SNSA and the Federal Restricted-Fee Determination

In 1990, after recognizing that "[t]he Federal and State governments have agreed that there is a moral responsibility on the part of both governments to help secure a fair and equitable settlement for past inequities" done to the Nation, Congress enacted the Seneca Nation Settlement Act of 1990. Pub. L. No. 101-503 § 2(a)(6), 104 Stat. 1292 (1990) ("SNSA"). Among other things, the SNSA appropriated funds for the Nation to use to acquire new land "within or near proximity to former reservation land" to compensate for the loss of such land, and established a process for placing that newly acquired land in restricted-fee status. *Id.* § 8(c). Under Section 8(c), land qualifies for restricted-fee status if (1) it is within the Nation's aboriginal area in the State or situated within or near proximity to former reservation land; (2) it was purchased with SNSA funds; and (3) state and local governments have been given 30 days after notice to comment on the removal of the land from real property tax rolls. Affirmation of Dean L. Chapman Jr. ("Chapman Aff.") Ex. 1 (Mem. from Principal Deputy Assistant Secretary–Indian Affairs to Regional Director, Eastern Region (Feb. 14, 2023)) ("Decision"), at 1. Unless the Secretary determines otherwise within 30 days after the comment period, such lands "shall be held in restricted fee status by the Nation." *Id.* at 1–2.

In October 2022, the Nation purchased land at 5 Miami Street and 124 Chicago Street in Buffalo (the "Miami Street Parcels"), which include the property at issue here (the "Site"), using SNSA funds. Decision at 2. On December 21, 2022, the Nation submitted its application to DOI and notified the State, Erie County, and the City of its intent to place the Miami Street Parcels in restricted fee. *Id.* at 1, 3; Notice of Removal ¶ 2. None of them objected or submitted any comment or opposition to the land going into restricted-fee status. Decision at 3.

On February 14, 2023, DOI determined that "the requirements of the SNSA have been met" and directed the Bureau of Indian Affairs Eastern Region to "record the deed to the Miami Street Parcels as 'restricted fee.'" *Id.* That determination rests on the Department's longstanding view that "lands placed in restricted status under the SNSA are set aside for the use of the Nation, and that such restricted status contemplated federal superintendence over these lands." Ex. 2 (Letter from Gale A. Norton, Sec'y of the Interior, to Cyrus Schindler, Pres., Seneca Nation of Indians (Nov. 12, 2002)) ("2002 Norton Letter"), at 6. The City thereafter acknowledged that the Nation had "applied for and w[as] granted a Restricted Fee Status by the United States Department of Interior," and that the parcels "are in fact entitled to the exemption associated with Restricted Fee Status." Ex. 3 (Letter from J. Shell, Comm'r, City of Buffalo Dep't of Assessment & Taxation (Aug. 7, 2023)). The Nation has operated a similar, smaller Seneca One Stop gas station on restricted-fee land at 180 Perry Street in Buffalo since 2020, which the City has never objected to or sought to regulate.

**B. The State Complaint**

More than three years later, on October 7, 2026, the City sued the President and the members of the Council of the Nation, in their official capacities, in New York Supreme Court, Erie County, to stop the Project. State Compl. ¶¶ 1, 14, 18 (ECF No. 1-3).

The State Complaint is built on the City's assertion of regulatory jurisdiction over the Site. It acknowledges that DOI purportedly allowed the Site to pass into 'restricted fee' status by decision dated February 14, 2023, which Defendants claim "removes the Site and the Project from the City's regulatory jurisdiction," *id.* ¶ 9, but contends that the Site should not have qualified because the SNSA funds had been "depleted" before the Nation purchased it, *id.* ¶¶ 10–11. It further alleges that "the status of the Site does not change the City's ability to regulate the Project," *id.* ¶ 12, and that "the Site has been under the regulatory jurisdiction and authority of the City of

Buffalo and State of New York for more than a century," *id.* ¶ 47. The City grounds its authority in the Municipal Home Rule Law, which permits municipalities to enact local laws for the "government, protection, order, conduct, safety, health and well-being of persons or property therein." *Id.* ¶¶ 27–28 (quoting N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(11)–(12)).

The State Complaint asserts two causes of action. The first alleges that "[t]he Site and the Project are subject to regulatory conditions and permitting requirements" under the Buffalo Unified Development Ordinance, the Buffalo City Code, and the New York Building Code, and that Defendants have not obtained the required approvals. *Id.* ¶¶ 76, 80–85. The second, for public nuisance, rests on the allegations that Defendants "declined to follow zoning and environmental reviews" and "began construction on the Project in violation of City law." *Id.* ¶¶ 93–94. In its prayer for relief, the City asks the court to "[d]eclar[e] the Site is subject to the municipal jurisdiction of the City of Buffalo including land use, tax, police, and environmental laws," and to enjoin construction until City permits are issued. *Id.* at 18 ¶¶ i–ii).

**C. Removal and the City's Parallel Federal Action**

Defendants removed the action on October 8, 2026, under 28 U.S.C. §§ 1331, 1441, and 1446, on the ground that the City's claims necessarily raise substantial federal questions regarding whether the land was validly taken into restricted-fee status and whether a municipality may regulate land held in restricted fee under the SNSA. Notice of Removal at 1, ¶¶ 3–12.

The same day, the City sued DOI and the United States in this Court under the Administrative Procedure Act, invoking 28 U.S.C. § 1331 and seeking vacatur of the Decision and a declaration that "the Site is under the regulatory jurisdiction of the City of Buffalo." APA Compl. ¶¶ 33–34.

On October 9, 2026, the City moved to remand. ECF No. 5.

## LEGAL STANDARD

A defendant may remove a state-court action that could originally have been filed in federal court. 28 U.S.C. § 1441(a). District courts have original jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A cause of action arises under federal law "when the plaintiff's well-pleaded complaint raises issues of federal law." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).

In addition, "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Jurisdiction lies where the state-law claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314; *see also Gunn v. Minton*, 568 U.S. 251, 258 (2013). Where these requirements are met, "jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *N.Y. ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016) (quoting *Gunn*, 568 U.S. at 258). A state-law claim "necessarily" raises a federal question where it is "affirmatively 'premised'" on federal law, *id.* at 315–16, or where "the pertinent 'question of federal law'" is "a necessary element of one of the well-pleaded state claims," *State ex rel. Tong v. Exxon Mobil Corp.*, 83 F.4th 122, 140 (2d Cir. 2023) (citations omitted). The "actually disputed" requirement is satisfied when the federal issue is "the only" or "the central" point in dispute. *Jacobson*, 824 F.3d at 316 (quoting *Grable*, 545 U.S. at 315).

Defendants bear the burden of establishing federal jurisdiction. *Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004); *see also Tong*, 83 F.4th at 132. Because

remand orders are ordinarily unreviewable on appeal, 28 U.S.C. § 1447(d), a court "should be cautious about remand, lest it erroneously deprive defendant of the right to a federal forum." *Landesbank Baden-Württemberg v. Cap. One Fin. Corp.*, 954 F. Supp. 2d 223, 225 (S.D.N.Y. 2013) (citations omitted).

"In the Second Circuit, the standard for issuance of a [TRO] is the same as the standard for a preliminary injunction." *Martin v. Warren*, 482 F. Supp. 3d 51, 68 (W.D.N.Y. 2020). A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). The movant must establish "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Absent a clear command from Congress, courts must apply that traditional test. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024).

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction," *NuPower, LLC v. Charter Oak Microgrid Holdco, LLC*, No. 1:26-CV-00494, 2026 WL 1960869, at *8 (N.D.N.Y. June 30, 2026) (citation omitted), and the movant must show "an 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages,'" *id.* (quoting *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025)). Relief based "only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy." *Winter*, 555 U.S. at 22. Because a "finding of no showing of irreparable harm is dispositive," a court need not reach the remaining factors where

the movant fails on that element. *NuPower*, 2026 WL 1960869, at *10 (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007)).

## ARGUMENT

## I. THE MOTION TO REMAND SHOULD BE DENIED

### A. The City Has Pleaded A Significant Federal Question Under *Grable*

The City has pleaded a significant federal question as an essential element of its claims—namely, that it, rather than the Nation and federal government, has regulatory jurisdiction over the Site—and seeks a declaration of the same as part of its prayer for relief. *See* State Compl. at 18 ¶¶ i–ii (seeking declaration that "the Site is subject to the municipal jurisdiction of the City of Buffalo including land use, tax, police, and environmental laws"). The State Complaint further attacks the Decision, alleging that the SNSA funds were "depleted" before the Nation bought the Site. State Compl. ¶¶ 9–11. That is necessarily a challenge to the federal decision to take the land into restricted-fee status.

To be sure, the City sometimes calls the Site's restricted-fee status "not dispositive" and insists that "the status of the Site does not change the City's ability to regulate the Project." State Compl. ¶¶ 10, 12. But its APA Complaint, filed in this Court the next day, concedes that the Decision "impairs the City's regulatory, zoning, and police power over land inside its geographic boundaries," APA Compl. ¶ 47, and that "[v]acating the Decision would confirm the City's tax authority over the Site and preserve the City's control over local infrastructure and utility services, and restore local control," *id.* ¶ 50. And it asks this Court to declare that "the Decision violated the [SNSA] and the Site is under the regulatory jurisdiction of the City of Buffalo." *Id.* ¶ 33.[2]

[2] It must do so because federal regulation explicitly holds that Indian land subject to a restriction on alienation is not subject to municipal jurisdiction: "[N]one of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or

By its own account, then, the City lacks regulatory jurisdiction over the Site unless this Court first declares the Decision invalid or ineffective, so every claim in the State Complaint depends on the validity and effect of a federal agency action taken under a federal statute. Because the City made the relative scope of federal and municipal jurisdiction over the Site an essential element of its own claims, each of the four requirements is met. *See Gunn*, 568 U.S. at 258; *Grable*, 545 U.S. at 314.

i. The City Affirmatively Pleaded the Relative Scope of Federal and Municipal Jurisdiction as an Essential Element of Its Claims

The City has necessarily raised a federal question by affirmatively pleading the relative scope of federal and municipal jurisdiction as an essential element of its claims in both complaints. Starting with the source of the authority the City seeks to enforce. The City grounds its claims in the Municipal Home Rule Law, which authorizes local laws for the "government, protection, order, conduct, safety, health and well-being of persons or property therein." State Compl. ¶¶ 27–28 (quoting N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(11)–(12)); *see also* N.Y. Const. art. IX, § 2(c). The other sources of the authority the City invokes are similarly bounded: the Buffalo Unified Development Ordinance and City Code rest on General City Law § 19, which grants each city power "to regulate, manage and control *its* property and local affairs" (emphasis added), and the City's authority to enforce the State Building Code rests on Executive Law § 381(2). Under New York law, a municipality's regulatory jurisdiction "is confined to its territorial limits." *Vill. of Huntington Bay v. N.Y. State Dep't of Env't Conservation*, 235 A.D.3d 881, 884 (2d Dep't 2025) (citation omitted). A municipality that seeks to enforce its code where its jurisdiction does not reach fails to state a claim at all. *See Town of Carmel v. Melchner*, 105 A.D.3d 82, 92–98 (2d

used under agreement with and belonging to any Indian or Indian tribe, band, or community that is . . . subject to a restriction against alienation imposed by the United States." 25 CFR § 1.4(a); *see also CACGEC*, 802 F.3d at 285 n.15 (quoting same).

Dep't 2013) (dismissing town's claim for injunctive relief under its code where the docks at issue were in waters subject to State, not town, jurisdiction); *Town of N. Hempstead v. Vill. of N. Hills*, 38 N.Y.2d 334, 337–38 (1975) (each municipality "has jurisdiction and, therefore exclusive discretion, in planning and zoning determinations within its territorial boundaries"). That territorial limit is thus built into the City's first cause of action: the City cannot establish a violation of its zoning, permitting, or building codes without first establishing that the Site is "property therein" subject to City regulation. Indeed, that is exactly what the City pleads: "The Site and the Project are subject to [the City's] regulatory conditions and permitting requirements." State Compl. ¶ 76.

The second cause of action is pleaded the same way. Although a public nuisance generally consists of "conduct that amounts to a substantial interference with the exercise of a common right of the public," *532 Madison Ave. Gourmet Foods*, *Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001) (citing *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568 (1977)); *accord Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*, 405 F. Supp. 3d 408, 441 (W.D.N.Y. 2019), the City has not pleaded a free-standing common-law nuisance; it alleges that the nuisance arises because Defendants "declined to follow zoning and environmental reviews" and "began construction on the Project in violation of City law." State Compl. ¶¶ 93–94. As pleaded, the nuisance claim depends on the same predicate as the first cause of action: that City law, rather than federal and Nation law, governs the Site.

The breadth of the declaration the City seeks confirms the point. The City asks for a declaration that sweeps not just over land-use and environmental requirements, but also the City's "tax" and "police" authority over the Site. State Compl. at 18 ¶¶ i–ii. That is a free-standing determination of the Site's jurisdictional status—and, not coincidentally, the same declaration the

City seeks in its APA action under 28 U.S.C. § 1331. APA Compl. ¶¶ 33–34. If the City's claims truly did not depend on the Site's status, the City would have no need for such a broad declaration.

Thus, unlike a case where the federal question entered only as a defense, the City has necessarily pleaded the federal question as an element of every claim—placing this case alongside the many decisions in this Circuit holding that a state-law claim necessarily raises a federal issue where the plaintiff must establish a federal-law predicate to prevail. *See Jacobson*, 824 F.3d at 317 (state False Claims Act claim required proof that trusts did not qualify for federal REMIC status); *New York v. Arm or Ally, LLC*, 644 F. Supp. 3d 70, 78–79 (S.D.N.Y. 2022) (State had to "demonstrate that the products at issue . . . were 'firearms' or 'component parts' thereof within the meaning of federal law"); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 922 F. Supp. 2d 475, 482, 484 (S.D.N.Y. 2013) (negligence claims turned on whether NASDAQ's conduct was consistent with its federal regulatory responsibilities); *N.Y.C. Health & Hosps. Corp. v. WellCare of N.Y., Inc.*, 769 F. Supp. 2d 250, 256 (S.D.N.Y. 2011). Like the quiet-title plaintiff in *Grable*, whose claim was "premised" on the IRS's alleged failure to comply with a federal notice statute, 545 U.S. at 314–15, the City premises its claims on the alleged failure of DOI to apply the SNSA correctly. State Compl. ¶¶ 9–11.

Contrary to the City's contentions, its claims would obviously not be "the same regardless of the developer or parcel owner," Mem. of Law in Supp. of. City of Buffalo's Mot. to Remand, TRO and PI, ECF No. 5-1 ("City Mem.") at 5, the City itself pleads the Site's ownership and federal status as the predicate for its claims. State Compl. ¶¶ 9–12, 47. Just as a government entity could not enforce its zoning code against a parcel in a neighboring municipality, *see Town of N. Hempstead*, 38 N.Y.2d at 337–38, or enforce its code in waters within the State's exclusive jurisdiction, *see Town of Carmel*, 105 A.D.3d at 92–98, the City cannot establish its claims without

first proving that it has power to regulate the Site at all—a question that, as the City concedes, turns on federal law.

ii. <u>The Federal Issue Is Actually Disputed and Substantial</u>

The federal issue is also actually disputed. Indeed, it is "the central" point in dispute, *Jacobson*, 824 F.3d at 316: the City contends that it has regulatory jurisdiction over the Site, while DOI determined that the Site is held in restricted fee and the Nation maintains that it is subject to tribal, not municipal, jurisdiction. As the APA Complaint confirms, the City is necessarily attacking the DOI's Decision. *See* State Compl. ¶¶ 9–11 (arguing that settlement funds "depleted" before DOI "purportedly" took land into restricted-fee status); APA Compl. ¶¶ 28–29, 96–124 (arguing that the Site was not purchased with SNSA money and fails the Act's geographic requirements).

The issue is also substantial. The substantiality inquiry "looks . . . to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. "Indian sovereignty and the congressional goal of Indian self-government" are "important federal interests." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216–17 (1987). Congress struck the jurisdictional balance for SNSA lands, and the Second Circuit has held that "Congress intended lands purchased with [SNSA] funds and held in restricted fee to be subject to the Seneca Nation's tribal jurisdiction," and that, as to such lands, "New York has . . . been divested of its jurisdiction." *CACGEC*, 802 F.3d at 282–86. Courts have repeatedly recognized that whether land is Indian land under a federal settlement statute presents a substantial federal question supporting jurisdiction over state-law claims. *See Michigan v. Bay Mills Indian Cmty.*, 695 F.3d 406, 413 (6th Cir. 2012) (state-law claims "'arise under' federal law" because each "presents a question of federal law (whether the . . . casino is located on Indian lands)" acquired under a federal land-claims settlement act, and "Indian law is primarily the province of the federal courts" (citation

omitted)), *aff'd*, 572 U.S. 782 (2014); *Carney v. Washington*, 551 F. Supp. 3d 1042, 1051–54 (W.D. Wash. 2021) (state-law property claims against tribe removable because tribe's rights to land are "an important issue of federal law that sensibly belongs in a federal court" (citations omitted)).

Here, the City challenges the validity of a federal agency's determination under a federal statute—precisely the circumstance in which the government "has a direct interest in the availability of a federal forum to vindicate its own administrative action." *Grable*, 545 U.S. at 315; *Gunn*, 568 U.S. at 260–61; *Facebook*, 922 F. Supp. 2d at 482, 484. The City's parallel APA suit confirms the point: It invokes this Court's federal-question jurisdiction to resolve the identical question, APA Compl. ¶ 34, and warns that the Decision "portends a thicket of perpetual challenges to local jurisdiction" because the same process could be used "again, and again, in perpetuity," *id.* ¶ 32. A question the City describes as threatening recurring conflict over the boundaries of local jurisdiction across Western New York is, by any measure, important to the federal system as a whole.

iii. <u>A Federal Forum Will Not Disturb the Federal-State Balance</u>

Exercising jurisdiction here will not disturb any congressionally approved balance of federal and state judicial responsibilities. That inquiry "focuses principally on the nature of the claim, the traditional forum for such a claim, and the volume of cases that would be affected." *Jacobson*, 824 F.3d at 316. Each consideration favors a federal forum. "Indian law is primarily the province of the federal courts," and "there is no reason to think Congress would prefer this question to be resolved by state courts." *Bay Mills*, 695 F.3d at 413. The status of tribal land is governed by federal law and routinely decided by federal courts. *See CACGEC*, 802 F.3d at 282–86. And cases turning on the validity and effect of a SNSA restricted-fee determination are rare,

so jurisdiction here will "portend only a microscopic effect on the federal-state division of labor" and will not open the door to ordinary zoning disputes. *Grable*, 545 U.S. at 315.

The federal government's own interests point the same way. A challenge to a federal restricted-fee determination implicates the United States as a required party. Under Rule 19(a), a party is required if, in its absence, the court "cannot accord complete relief among existing parties," or if the absent party "claims an interest relating to the subject of the action" such that disposing of the action without it would impair that interest or expose an existing party to inconsistent obligations. Fed. R. Civ. P. 19(a)(1); *see Caruso Glynn, LLC v. Liberty Corp. Cap. Ltd.*, No. 1:25-CV-04312, 2026 WL 2640723, at *6 (E.D.N.Y. Sept. 8, 2026). The United States holds the federal superintendence that restricted-fee status entails, and the City cannot obtain complete relief—a declaration that the Site is within municipal jurisdiction notwithstanding the Decision—without a ruling that binds the agency that made it. *Cf. Sunset Homeowners Ass'n v. DiFrancesco*, 386 F. Supp. 3d 299, 306 (W.D.N.Y. 2019) (holder of an interest in the property was a required party because relief against the other defendant alone would not be complete).

Indeed, that is presumably why the City sued the United States in its APA action—and asked this Court to decide whether the Decision is valid and to declare the Site within the City's regulatory jurisdiction. APA Compl. ¶¶ 31, 33–34. Having invoked federal jurisdiction over that question in one case, the City cannot credibly contend that a federal forum would upset the federal-state balance in the other. *See Arm or Ally*, 644 F. Supp. 3d at 82–83 & n.6 (no disruption of federal-state balance where the State chose to make a federal question part of its claims and the same court was already presiding over a parallel federal action on the same issues). Keeping both cases in federal court also avoids the risk of inconsistent rulings on the same federal Decision, and remand would foreclose the most efficient means of avoiding that risk: a federal court lacks authority to consolidate a federal action with one pending in state court. *See* Fed. R. Civ. P. 42(a);

*Dinardi v. Ethicon, Inc.*, 145 F.R.D. 294, 296 (N.D.N.Y. 1993); *Peralta v. Matz*, No. 22-CV-2422, 2025 WL 2208328, at *4 (E.D.N.Y. Aug. 4, 2025).

**B. The City's Arguments For Remand Fail**

None of the City's arguments for remand is persuasive. The City's lead argument is that Defendants removed solely on the basis of a defense (regarding tribal "immunity"), which under *Oklahoma Tax Commission v. Graham*, 489 U.S. 838, 841 (1989), cannot convert a state-law suit into a federal one. City Mem. at 2, 4. That mischaracterizes the Notice of Removal, which mentions immunity only in a footnote and does not rely on it as a ground for removal. Notice of Removal ¶ 16; *id.* at 4 n.1. Removal instead rests on 28 U.S.C. § 1331 and *Grable*, based on the City's own claims and prayer for relief. *Id.* ¶¶ 3–12.

The City's reliance on *Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987), and the preemption cases that follow it, is also misplaced. City Mem. at 5–7 & n.3. Those cases hold that a federal preemption defense, even if anticipated in the complaint, does not make a state-law claim removable. Again, the Nation did not remove on preemption grounds (or any other defense), but rather based on the fact that the City's complaint raises a significant federal question under *Grable*. *E.g.*, *Belmont v. JetBlue Airways Corp.*, 401 F. Supp. 3d 348, 358–60 (E.D.N.Y. 2019) (analyzing complete preemption and *Grable* separately); *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1019, 1021 (2d Cir. 2014) (state-law framing "does not necessarily preclude the exercise of federal jurisdiction" where the duty underlying the claims "derives directly from federal law"); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194–95 (2d Cir. 2005) (federal issue "apparent from the face of the complaint, without reference to any anticipated defense").

Nor does *New York v. Shinnecock Indian Nation*, 686 F.3d 133 (2d Cir. 2012), control. City Mem. at 2, 5, 7. There, a tribe (which not yet federally recognized at the time of the suit) argued that the state lacked jurisdiction over certain land. The decisive difference is that

*Shinnecock* did not involve an attack on a federal land-status determination. *See Massachusetts v. Wampanoag Tribe of Gay Head*, 36 F. Supp. 3d 229, 236 n.7 (D. Mass. 2014) (distinguishing *Shinnecock* on ground that "the land on which [the Shinnecock] proposed to build was not Indian land within the scope of" relevant Act). The tribe's claimed authority over the land there rested on "aboriginal title" alone, so the plaintiffs neither needed to challenge, nor did challenge, any federal determination as to the land status; federal law entered the case only to "anticipate and refute the Shinnecock's defenses." *Shinnecock*, 686 F.3d at 136, 139.[3] Here, by contrast, the City itself has affirmatively pleaded the fact that DOI made a federal determination to place the Site in restricted-fee status—and thus that "New York has . . . been divested of its jurisdiction." *CACGEC*, 802 F.3d at 282–86; *see* State Compl. ¶¶ 9–12; APA Compl. ¶¶ 26–33.

Relatedly, *Shinnecock* treated the land-status question as the tribe's to raise. The majority rejected the district court's view that the State bore the burden of proving that aboriginal title had been extinguished, explaining that the governing statute "would appear to implicate the Tribe's affirmative defense inasmuch as it places upon tribes the burden of 'mak[ing] out a presumption of title' in the first instance." 686 F.3d at 140 n.4; *see also id.* at 140–41 & n.5. Here, no tribe must "make out" anything: as the City's State Complaint makes clear, DOI has already made and recorded the restricted-fee determination, and the City, to obtain the relief it seeks, must overcome that Decision, as it seeks to do in the APA action.

Nor can the Court here "resolve[] the case without reaching the federal issues." *Shinnecock*, 686 F.3d at 140–41; *see also Tong*, 83 F.4th at 140. *Shinnecock* itself recognized that the result would have differed if "the indisputably federal 'Indian land' issue ar[ose] . . . in the

[3] Indeed, after the Department later recognized the Shinnecock parcel as within the tribe's aboriginal territory, a federal court observed that *Shinnecock* "pre-dates" that federal determination. *Shinnecock Indian Tribe v. Hochul*, No. 25-CV-07034, 2026 WL 279849, at *3 (E.D.N.Y. Feb. 3, 2026).

context of the plaintiff's claim rather than as an affirmative defense." *Shinnecock*, 686 F.3d at 141 n.7. That is this case. The City cannot reach the question whether the Project complies with City law until it establishes that City law applies to restricted-fee land at all—a predicate the City itself has pleaded and asked the court to declare. State Compl. ¶¶ 9–12, 76 & 18 ¶¶ i–ii.

## II. <u>THE CITY'S MOTION FOR A TRO SHOULD BE DENIED</u>

### A. The City Is Unlikely To Succeed on Its Claims

#### i. <u>The Site Is Not Subject to Regulation by the City</u>

The City is unlikely to succeed on its claims, because the Site is not subject to its jurisdiction. To the contrary, the Site is subject to "tribal jurisdiction" under the SNSA.

Congress passed the SNSA in 1990 to address more than a century of mistreatment of the Seneca Nation and its lands. This history is set forth at length in the seminal case interpreting the SNSA. *CACGEC*, 802 F.3d at 271–75. To address the historical mistreatment, the federal government appropriated $35 million to the Seneca Nation "to be managed, invested, and used by the [Seneca] Nation to further specific objectives of the [Seneca] Nation and its members, all as determined by the [Seneca] Nation in accordance with the Constitution and the laws of the [Seneca] Nation" and "to be used for the economic and community development of the Seneca Nation." *Id.* at 273. New York state appropriated an additional $25 million. 25 U.S.C. § 1774d(c) (2010) (omitted from the Code pursuant to editorial reclassification).

The SNSA permits the Nation to use SNSA funds to acquire additional lands, subject to specific statutory requirements, and the Nation followed all of them. *See supra* Factual and Procedural History § A; 25 U.S.C. § 1774f(c) (2010). On or about December 21, 2022, it applied to DOI to place the Site into restricted-fee status, explaining why the land satisfied the SNSA's

geographic requirements and had been acquired with SNSA proceeds.[4] It notified all state and local authorities, including New York State, Erie County, and the City, that the "Seneca Nation is moving forward with the placement of land into restricted fee status in the City of Buffalo, Erie County, New York, commonly referred to as the 'Miami Street Parcels,' which are in near proximity to the former Buffalo Creek Reservation and the existing facility that was approved pursuant to Section 11(a)(2) of the Seneca Nation-New York Compact" and that such "notice to the City of Buffalo fulfills the notice requirements under the Seneca Nation SNSA."[5] No local or state authority objected or otherwise commented. At DOI's request, on January 25, 2023, the Nation provided further information on the source of the acquisition funds and confirmed whether it had received any comments in response to the notice letter.[6] On February 14, 2023, DOI issued the Decision, "determin[ing] that the requirements of the SNSA have been met" and directing the Nation to "proceed to record the deed to the Miami Street Parcels as 'restricted fee.'"[7]

By this process, the United States placed the Site into "restricted-fee status" and recorded the land in restricted-fee status in the Bureau of Indian Affairs Branch of Land Titles and Records. As such, the Site is subject to the Nation's tribal jurisdiction, not the jurisdiction of the City. The Seneca Nation's authority over the Site to the exclusion of the City is established in *CACGEC*: "Thus, we conclude that Congress—through the [SNSA]—set aside the Buffalo Parcel for the Seneca Nation's use in order to further tribal interests and provided that the Parcel would be subject

[4] Defendants intend to file a redacted version of these papers in connection with its opposition to the Preliminary Injunction.

[5] The City attached the letter sent to the City of Buffalo as Exhibit 2 to the Rossi Declaration (ECF No. 1-8), *see also* Exhibit 5. Additionally, attached hereto as Exhibit 4 is a copy of the Federal Express receipt confirming delivery to the City of Buffalo on December 22, 2022 at 12:14.

[6] Defendants intend to file a redacted version of these papers in connection with its papers in opposition to the Preliminary Injunction.

[7] Chapman Aff. Ex. 1 (Decision) at 3.

to federal superintendence. Because these dual requirements are met, *the Seneca Nation has jurisdiction over this land, and New York has therefore been divested of its jurisdiction*." *CACGEC*, 802 F.3d at 283–84 (emphasis added); *see supra* Part I.A (City's concession in APA Complaint). CACGEC's conclusion tracks with 25 CFR § 1.4(a) which established as a matter of federal law that "none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is . . . subject to a restriction against alienation imposed by the United States."

Thus, there is no question that the Site is subject to tribal jurisdiction, not municipal jurisdiction. *CACGEC*, 802 F.3d at 286 ("[W]e hold that Congress intended lands purchased with [SNSA] funds and held in restricted fee to be subject to the Seneca Nation's tribal jurisdiction"). Tribal jurisdiction is "a combination of tribal and federal jurisdiction over land, *to the exclusion of the jurisdiction of the state*." *Id.* at 279–80 (emphasis added).

Although state and local authorities are divested of regulatory control over restricted-fee lands, the SNSA itself incorporates an important safeguard: that the Seneca Nation give all state and local authorities notice and opportunity to comment on the application to move land into "restricted-fee" status. As the Second Circuit found, by providing the 30-day notice period to state and local governments, "[t]he [SNSA] . . . anticipates the jurisdictional tensions between the federal government, the tribe, and the state, and provides the Secretary [of the Interior] with discretion, after considering the state's concerns, to determine the jurisdictional ramifications of conferring this new status on the lands." *Id.* at 285.

In its moving papers (ECF No. 1-17), the City cites certain cases suggesting that municipalities should continue to exercise jurisdiction where they have "settled expectations" of their right to regulate land. The City's cases are inapplicable, as none of them involve land acquired under the SNSA or any other analogous act of Congress which specifically regulates how land may be acquired and placed into "restricted-fee status," divesting the municipality of jurisdiction. *See, e.g.*, *Comm'r of N.Y. DOT v. Polite*, 236 A.D.3d 82, 121 (2d Dep't 2024) (granting preliminary injunction where the land in question failed to qualify as Indian Country and where the land had never been taken into "restricted-fee" status per an act of Congress); *Town of Southampton v. Goree*, 229 N.Y.S.3d 906, at *6, *8 (Sup. Ct., Suffolk Cnty. 2025) (rejecting claim that land was in "restricted-fee" status because the defendants' "refer[ed] to no legal authority or legal analysis supporting the determination that [the property] is restricted fee land.").

In fact, in *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), one of the principal cases relied on by the City, the Supreme Court expressly recognized that, while an Indian Nation may not "unilaterally revive its ancient sovereignty," tribal jurisdiction could be established via congressionally authorized avenues. *Id.* at 203, 220. That is precisely what happened here where "the land became subject to tribal jurisdiction pursuant to an express act of Congress and approval of the Secretary." *CACGEC*, 802 F.3d at 284 n.14 (citing *Sherrill* for this exact point). And the concern expressed in these cases regarding "settled expectations" is mitigated by the fact that the SNSA contains an explicit procedure by which state and local governments can object to or otherwise comment on an application by the Nation to place land into "restricted-fee status."

Here, the City was indisputably given notice and an opportunity to object before the land was placed into restricted-fee status, but declined to do so. Its claims seeking a declaration that

the Site "is subject to the municipal jurisdiction of the City of Buffalo" are foreclosed by the SNSA and *CACGEC*.

ii. The Suit is Barred by Principles of Sovereign Immunity

Under U.S. law, Indian tribes are domestic sovereign nations. Therefore, Indian tribal governments may be sued only if the suit is expressly authorized by Congress or if the tribe has expressly waived its immunity from suit. *See, generally*, *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751 (1998). Sovereign immunity extends to tribal officials working in their representative capacity and within the scope of their authority. *See Lewis v. Clarke*, 581 U.S. 155, 163 (2017) (applying federal and state sovereign immunity principles to tribal sovereign immunity, where "[d]efendants in an official-capacity action may assert sovereign immunity" in contrast with defendants sued in their individual capacity).

Anticipating this defense, the City argues "that defendants are not immune from suit because they are acting outside of any SNI reservation," State Compl. ¶ 17, *i.e.*, "outside of Indian lands." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019) (no immunity where defendants were extending loans to Plaintiffs in Vermont). But this simply isn't so. For the reasons set forth *supra*, the Site is held in "restricted-fee" status pursuant to the SNSA, and under federal law restricted-fee lands are "Indian Country." *See CACGEC*, 802 F.3d at 283–84, 286; *see also Cayuga Nation v. Tanner*, 448 F. Supp. 3d 217, 221, 244 (N.D.N.Y. 2020) (distinguishing *Gingras* where the municipality attempted to regulate the Cayuga Nation's gambling activities on a "parcel of historic reservation land the Cayugas repurchased from the open market in 2003"), *aff'd*, 6 F.4th 361 (2d Cir. 2021); Chapman Aff. Ex. 2 (2002 Norton Letter) at 6 ("[T]he SNSA authorizes lands held in restricted status to expand the Nations reservation boundaries, or become part of the Nation's reservation").

The actions taken by the Defendants at issue in this lawsuit – constructing a gas station on "restricted-fee" land – are in their official capacity and occurring on sovereign land. Accordingly, the City is not likely to succeed in overcoming Defendants' sovereign immunity defense.

**B. The City Will Not Suffer Irreparable Harm if a TRO is Denied**

There is no emergency here, and the City will suffer no irreparable harm if a TRO is denied. Contrary to the City's claims in its papers, the City has known that the Site is in "restricted-fee" status since at least August 7, 2023 (i.e., more than three years ago),[8] and has known about the Nation's intention to build a gas station at the Site since at least April 7, 2026 (i.e., more than six months ago). On April 7, 2026, the Nation's contractor Carmina Wood Design sent designs for the Seneca One Stop gas station to representatives of the City's Sewer Authority.[9] For six months thereafter, the Nation and the Buffalo Sewer Agency had extensive negotiations around a Stormwater Control Facility Maintenance Agreement to manage stormwater run-off from the Site. (The Nation does not seek City approvals or permits for work solely on its sovereign land, but does work with the City to comply with all "tie-in" regulations, such as those related to stormwater drainage.) The City completely omits these discussions in its papers, falsely alleging that the Project is "barreling forward, with no coordination with local government." ECF No. 1-17 at 17.

The City could have acted any time after April 7, while the Project was still in its developmental stage. Instead, it waited until the Nation started construction. The City has created an emergency of its own making, and under such circumstances it is unjust to enter injunctive relief against the Nation.

---

[8] *See* Ex. 3 (conceding that the Seneca Nation is "the owner of the above referenced properties and applied for and [was] granted a Restricted Fee Status by the United States Department of the Interior" and stating that the City had "verified that the referenced properties are in fact entitled to the exemption associated with Restricted Fee Status.").

[9] A copy of an email exchange between the Seneca Nation and the Buffalo Sewer Authority is attached hereto as Exhibit 6.

In any event, there is no irreparable harm. Construction of the Seneca One Stop is in its very early stages and will not be complete until June 28, 2027 at the earliest. Thus, the City's complaints about harm once the gas station is operating (such as traffic, road damage, and competition with local businesses) will not come to fruition for more than eight months. That does not justify a TRO halting all construction now, before the City's request for a preliminary injunction is even briefed.

The closest the City comes to alleging imminent harm is that the construction underway represents an environmental concern. That concern is speculative and based on little more than environmental contamination identified more than a decade ago. But the City's own evidence indicates that those matters were addressed through the regulatory cleanup processes. Paananen Aff. Ex. A (ECF No. 1-15) (DEC spill investigations "closed because . . . the records and data submitted indicate that the necessary cleanup and removal actions have been completed and no further activities are necessary"). The City also notes that an adjacent parcel of land contained contamination—but its own evidence reflects that NYSDEC has determined that the cleanup requirements for that parcel "have been or will be" met. Paananen Aff. Ex. B (ECF No. 1-16). The City offers no evidence of current contamination at the Site that threatens imminent harm, and its claims of environmental harm are thus too speculative to support a finding of irreparable harm. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) ("Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."); *Mahoney v. U.S. Dep't of the Interior*, No. 22-CV-01305-FB-ST, 2022 WL 1093199, at *2 (E.D.N.Y. Apr. 12, 2022) (noting that "Plaintiff must demonstrate that irreparable harm is not just possible, but likely," and rejecting plaintiffs' claim of irreparable harm where claim of potential environmental contamination was too "conclusory.").

No party is more concerned about the health and safety of its sovereign land than the Nation. To that end, before proceeding with construction, the Nation engaged (and is continuing to engage) in substantial environmental testing (and, if necessary, remediation) under the supervision of the Nation's Environmental Protection Department. For example, the Nation has excavated, stockpiled, and tested 12,000 tons of soil. Preliminary testing results indicate the soil is non-hazardous, and the Nation has applied to move all this soil to an appropriate landfill. Additional environmental controls have been in place from the outset, including a silt barrier around the Site to prevent runoff and watering of the Site on dry days to prevent soil from blowing off—the very concern the City raises. Rather than *preventing* irreparable harm, injunctive relief would actually *cause* harm by halting this work midstream, including the removal of excavated soil to an appropriate offsite landfill for disposal.

The environmental testing protocol raises an important issue the Court should understand. To read the City's papers, one might assume that the Site is subject to no regulatory authority whatsoever. Of course this is wrong. The sovereign Seneca Nation has its own constitution, its own laws, and has government agencies that have a role in safety inspections (e.g., the Seneca Nation Environmental Protection Department). It manages its land and shares concurrent jurisdiction with the federal government, giving the federal government a regulatory role as well. In other words, there are substantial protections in place to protect the health and safety of the Site and its impact on the surrounding area even if the City itself is divested of jurisdiction. *See Cayuga Indian Nation of New York v. Vill. of Union Springs*, 293 F. Supp. 2d 183, 198 (N.D.N.Y. 2003) (finding village's claim that "the health and safety of its citizens [were threatened] due to the Nation's failure to comply with local building and zoning Codes" was too speculative to support injunctive relief because the Nation had its own building code).

Also absent from the City's papers is any reference to the Nation's similar, already-operating Seneca One Stop at 180 Perry Street, which sits on land the Nation acquired with SNSA money and placed in restricted-fee status after written notice to the City. The City did not object then, has never sought to regulate that station, and has not alleged any harm from it.

In sum, there is no evidence of irreparable harm justifying the imposition of a TRO.[10]

### C. The Balance of Hardships Does Not Tip in the City's Favor, and a TRO Would Disserve the Public Interest

The Nation has begun building Seneca One Stop, targeting completion by June 28, 2027. Any pause now in construction would disrupt and delay the Project, causing economic harm to the Nation in the form of increased construction costs and a delayed opening—harm that is especially unwarranted as (i) the City has been aware of the Project since at least April but did not act sooner when it was still in its development stage and (ii) the Nation is managing its own sovereign land in conformance with all relevant provisions of the SNSA. There is also the actual construction to consider. As the City notes in its motion papers, excavation has begun at the Site, and a large stockpile of excavated soil is awaiting transport to an offsite landfill. Enjoining the Project now would leave that soil and the open excavation on the Site indefinitely, rather than allowing them to be addressed in an orderly way—a result that serves neither the surrounding community nor the public interest.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court deny Plaintiff's motion

---

[10] The City's argument that a "violation of local zoning laws is sufficient to establish the harm needed to justify injunctive relief" also fails. ECF No. 1-17 at 11. Even if that might be true in some circumstances, it is inapplicable here where Defendants rightly argue that they are operating on sovereign land that is not subject to the zoning laws that the City contends apply. That issue was not present in any of the cases cited by the City on pages 11 and 19 of their memorandum of law relaxing the irreparable harm standard where zoning violation was established, all of which involved private actors, many of whom conceded the zoning violation.

to remand and deny Plaintiff's motion for a TRO.

DATED: October 13, 2026 Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP
By: /s/ Merrill C. Godfrey
Merrill C. Godfrey
James E. Tysse (*pro hac vice* pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Tel: 202-887-4000
mgodfrey@akingump.com
jtysse@akingump.com

Dean L. Chapman Jr. (admitted *pro hac vice*)
Stephanie Lindemuth (admitted *pro hac vice*)
Amama A. Rasani (admitted *pro hac vice*)
Swara Saraiya (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, NY 10036
Telephone: +1 212.872.1000
Facsimile: +1 212.872.1002
dchapman@akingump.com
slindemuth@akingump.com
arasani@akingump.com
ssaraiya@akingump.com

*Attorneys for Defendants J. Conrad Seneca, et al.*